St. L., I. M. & S. Ry. v. Gaines.

## St. L., I. M. & S. Ry. v. Gaines.

1. NEGLIGENCE: *Master and servant.*

    The master is not an insurer of the servant's safety, nor does he guarantee that the machinery, tools and instrumentalities he furnishes, may not prove defective. He only undertakes to use reasonable care to prevent injury to his servants.

2. SAME: *Same.*

    In an action by a servant against his master for an injury resulting from defective appliances furnished him for his work, he must prove affirmatively, not only that the appliances were defective, but that the master had notice of it, or was negligently ignorant of it. It is not sufficient merely to prove the injury, and that it resulted from a defect in the machinery, but he must further prove that it happened because the master did not exercise proper care in the premises.

3. RAILROADS: *Negligence. Brakeman and car-inspector fellow-servants.*

    A brakeman and car-inspector are fellow-servants, and each assumes the risk of the other's negligence in the performance of his services, and the company is not liable to either for the negligence of the other.

APPEAL from *Lafayette* Circuit Court.

Hon. C. E. MITCHEL, Circuit Judge.

*Dodge & Johnson*, for appellant.

*First*—The master is not an insurer of all the machinery furnished its employes; he is only bound to use ordinary care in providing tools, machinery, etc., and he only stipulates to use reasonable care to prevent them from being defective. He does not warrant the servant's safety, nor guarantee that the appliances may not prove defective. *35 Ark., 614; 44 ib., 529; 3 Wood on Rys., p. 1455; 68 ib., 551.*

The presumption is, that the master has done his duty in furnishing safe and suitable appliances, and when this

is overcome by proof of defects, the further presumption arises that the master had no notice or knowledge of the fact, and was not regligently ignorant of it. *Thompson on Neg.*, *1053; 16 C. B. (N. S.), 692.* It is not sufficient to show that plaintiff was injured from a defect in the machinery, but he must establish that the injury happened because the master did not exercise proper care in the premises. *Wood on Master and Serv.*, *sec. 382; Sh. & Redf. on Neg.*, *sec. 99; Pierce on Railroads, p. 373; ib., 382; 61 Iowa, 714; 67 Mo., 275; 42 Ala., 716; 89 Ill., 142; 92 Ill., 141; 32 Md., 416; 54 Wis., 260; 119 Mass., 412; 42 Mich., 39; 57 Tex., 507; 21 Cent. Law Jour., p. 53; 42 Wis., 520; 44 ib., 405; 46 ib., 265; 39 N. Y., 468; 50 Iowa, 685; 20 Mich., 105; 33 id., 133; 5 Ohio St., 541.*

The rules of the company forbade employes from uncoupling cars while in motion. He was injured by his own negligence and recklessness. An employe cannot recover for injury from a defect in machinery, unless the employer knew or ought to have known of the defect, and the employe did not know, or had not equal means of knowledge of it. *3 Dillon, C. C., 320; 50 Mo., 304; 29 Conn., 548; 92 Pa. St., 280; 80 Pac. Rep., p. 415; 51 N. Y., 476; Thompson on Neg., 1227; 21 N. W. Rep , 30; 109 Ill., 314.*

*Second*—A car-inspector is a fellow-servant with the trainmen, and a servant cannot recover for an injury caused by the negligence of a fellow-servant. *46 Mch., 258; 3 Woods, C. C., 313; 22 Hun., N. Y., 291–2; 70 N. Y., 171; 135 Mass., 205; 24 Ala., 21; 119 Mass., 419; 11 A. and E. R. Cases, 185; 8 ib., 175; 12 ib., 228; Wood on Railroad Law, vol. 3, p. 1494.*

St. L., I. M. & S. Ry. v. Gaines.

*Montgomery & Hamby*, for appellee.

*First*—We do not contend that the defendant, as master, was the insurer of all the machinery furnished to its employes, but we do contend and insist, that it was, and is, its duty to furnish its employes with good, safe and secure cars, with good and secure draw-heads attached thereto for the purpose of coupling such cars together, and if it furnishes its employes with a car, the draw-head of which is unsafe and insecure, and such defect could have been known by the exercise of reasonable care and diligence, and by reason of such defective, unsafe and insecure draw-head, an employe is injured and damaged while in the discharge of his duty, and using proper care, the defendant is liable to such employe in damages. *8 Am. and E. Ry. Cases, 85; ib., 119; 39 Ark., 17; 100 U. S., 213; 46 Mo., 163; 44 Ark., 300; Wood Mast. and Serv., secs. 329, 428; Wharton on Neg., secs. 210–211.*

A servant injured in the discharge of his duty is not required to show that he was *entirely* careful, but only to show that he was in the exercise of all the care that could reasonably be expected in view of the circumstances; and the fact that he would not have been injured, if he had not been in an exposed condition, will not debar him from a recovery. He has a right to rely upon it, unless obviously otherwise, that the machinery and appliances of the business are in proper repair and condition, and the question is, whether, if the master had discharged his duty in respect of the instrumentalities of the business, the servant's act would have been negligent? If not, he is not debarred from a recovery, and the question is purely one for the jury. *Wood's Master and Servant, p. p. 760, 914; Herbert v. N. P. Ry. Co., 8 A. and E. Ry. Cases, 85; Ry. Co. v. Carr, 35 Ind. Reps., 510; Hackett v. Middlesex Manf.*

*Co.*, *101 Mass.*, *101*; *B. and O. Ry. Co. v. State of Maryland*, *etc.*, *33 Md.*, *542*; *Cent. Law Journal*, *2.*, *p. 384*; *C. L. J.*, *vol. 4*, *431*; *ib.*, *vol. 6, 275*; *ib.*, *vol. 9, 38, 156*; *C., B. and Q. R. R. Co. v. Avery*, *109 Ill. Rep.*, *314.*

Nor is the plaintiff bound to prove affirmatively that he was himself free from negligence; it is a defense to be proved by the defendant. *15 Wall.*, *491*; *93 U. S.*, *291*; *24 Ohio St.*, *631*; *76 Penn. St.*, *631*; *46 Texas*, *536*; *Sh. and Redf.*, *on Neg.*, *sec. 99*; *ib.*, *sec. 13*.

*Second*—The second instruction given for the plaintiff is certainly the law. It is certainly the duty of the railway company to furnish its employes, running its trains, cars with good, safe and secure draw-heads attached for coupling the cars together, and if it should delegate this duty to another employe, the acts of such employe, as to the duty thus delegated to him, are the acts of the company. *Wood's Master and Servant, p p. 879–882.*

The Supreme Court of Minnesota, in the case of *Tierney v. Minneapolis and St. L. Ry. Co.*, reported in *No. 10, vol. 24, American Law Register*, held that: "It is incumbent upon a railway corporation, in the discharge of its duty as master, not only to provide machinery and instrumentalities for its employes which are suitable and safe, but also to use reasonable diligence to keep them so. Necessarily incident to these obligations is the duty of frequent inspection, and the corporation, acting by its servants in the discharge of such duty, is liable for their negligence." And further: "That negligence on the part of the inspectors in failing to properly discharge their duty, by reason of which plaintiff was injured while attempting to couple a damaged car without notice of its condition, and without fault on his part, might be imputed to the company." (*P. 669.*) We also refer to the authorities cited in this opinion.

The weight of authority, so far as we have been able to search, is that a car-inspector is *not* a fellow-servant with a brakeman working in the employ of the same railroad company. We refer the court to the following cases on this point: *Tierney v. M. and St. L. Ry. Co., supra; King v. Ohio, etc., Ry. Co., 8 A. and E. Ry. Cases, 119; R. R. Co. v. Fort., 17 Wal., 553; Dillon v. R. R. Co., 3 Dillon, 319; Ford v. F. R. R. Co., 110 Mass., 240; C., M. and St. P. Ry. Co. v. Ross, 20 vol. C. L. J., 27; 25 Am. Law Reg., No. 2, p. 148; 108 Ill., 576.*

A servant is not bound to inspect machinery to ascertain whether it is in proper repair or not. *Not only the defects, but the danger must be known to him.* If a servant cannot recover if he has the same *means of information* that the master has, *he would be bound to look for defects, to inspect the appliances of the business*, and would thus be burdened with the duties that legally and properly devolve upon the master, and could seldom recover for injuries resulting from the use of defective machinery. There is no such legal obligations imposed upon him. He is not bound to search for danger, except as to those risks that are patent to ordinary observation; he has a right to rely upon the judgment and discretion of his master, and that he will fully perform his duty toward him. *Wood's Master and Servant, p. p. 749–50.*

SMITH, J. The complaint alleged: That "on December 29, 1882, plaintiff, John Gaines, was in the employ of defendant railroad company as a brakeman; and while at work uncoupling cars on a through freight train, at the town of Malvern, Ark., on said day, by reason of a defective draw-head, he had the middle finger of his left hand so badly mashed that it had to be amputated—to his damage, $5,000."

The answer denied specifically all negligence on defendant's part, and charged contributory negligence on the part of the plaintiff.

The following evidence was then introduced by plaintiff.

The plaintiff stated: "On December 29, 1882, I was braking for Conductor Keeby, in employ of defendant. We left Texarkana that day at noon, on through freight. * * * At Arkadelphia the conductor directed me that on arriving at Malvern to set out of the train five or six cars. When the train stopped at Malvern, I went for the purpose of uncoupling a box car of the *Texas and Pacific Railway Company* from an *Iron Mountain* car. The *T. and P.* car *was numbered 1874*, and was, I believe, empty. It was about the tenth in the train from the engine. There were thirty-six cars in all. I was front brakeman, and it was my duty to uncouple these cars. I went between the two cars and tried to uncouple them while the train was standing still, but the pin was fast.

"I then gave the signal with my lantern to the engineer to back the engine, so as to slack the cars, and stepped again between the two cars. *As the cars backed I caught hold of the pin and attempted to pull it; I raised it about one and a half or two inches, when the end caught, and before I could get it out the draw-heads of the two cars came together, and the draw-head of the T. and P. car was driven in so far that my hand, which was on the pin, was caught between the head of the pin and the draw-head of the T. and P. car, and was crushed and held fast.* I tried, while my hand was so held, to signal the engineer to pull forward, but he misunderstood me, and *continued to back*, shoving backwards the whole train. My hand was held this way nearly five minutes, until the engineer took a turn forward, and I got out. * * * Immediately I got my hand loose, I went to the side of the car, stooped down and swung my lantern

up under the spring of the draw-head to see what was the matter. I saw the spring of the draw-head back of the draw-head on the T. & P. car was broken so as to let the draw-head slip in, and that was the reason my hand was caught between the coupling and the dead-wood.

" I could not tell whether the break in the spring was new or old. Had the spring been in good condition the draw-head could not have been driven far enough in to catch my hand between the draw-head and dead-wood. As brakeman it was my duty to couple and uncouple cars, as ordered by the conductor, to set brakes, to watch the couplings, and to look for hot boxes. I did not regard it my duty to go alongside of the train when we stopped, to see that nothing was out of order; I supposed that was the conductor's duty. * * * I had been braking at that time eighteen months, and was then twenty-two years old. * * * I went to the Employes' Hospital at St. Louis, where the hospital surgeon cut off my middle finger, which I have in my pocket (here plaintiff produced his finger and displayed it to the jury). The finger was taken off at the joint next the hand. I suffered greatly at the time of the accident, and for a week or ten days after. I stopped five weeks at the hospital. I did no work until May, when I tried braking again for a month, and on account of the weak and painful condition of my hand I could not keep it up, and had to quit. I was getting $60 per month braking, but now I can only earn $25 per month digging wells in Texarkana. Since leaving the hospital my doctor's bill has amounted to $50. I did not see on car 1874, " B. O.," or any other mark indicating that the car had been inspected and found in bad order at Texarkana. This train was made up at Texarkana, and I think all the cars were empty except one flat-car, which was loaded with cotton." .

*Witness then showed the manner in which he took hold of the coupling pin at the time, which was by catching his finger around the pin below the head, and holding his hand in a perpendicular position.*

*J. H. Keeby* testified for plaintiff: "In December, 1882, I was conductor on defendant's train. Plaintiff was a brakeman on my train. I did not see the accident to Gaines. I saw him after he had received the injury. *The couplings were good; there were no defects, for I examined the cars after he was hurt.* I have no personal knowledge of the manner of the injury. It was a good, level track. It was an ordinary draw-head, but from the manner it was put in it would slip back to the dead-wood. The dead-wood is a block of wood used for the protection of the car. The The draw-head mentioned above was on the box-car. The dead-wood projected out about six inches from the face of the car. I did not see the manner in which the train was backed in order to make the uncoupling. The condition of the draw-head was not as safe as if it had been in the usual condition. I did not see the draw-head until after the accident. This was a through freight train, and was made up by the yardmaster at Texarkana. I was in the freight office at Malvern when the accident happened.

"The duties of a brakeman are, to stop the train, couple and uncouple cars, set out and take on cars, examine and inspect trains whenever they have an opportunity—to see if anything is out of order—flag and switch and do whatever they are told by the conductor. Plaintiff was uncoupling cars when he was hurt. When hurt, he had been in defendant's employ two or three months, and was a capable and competent man. He had coupled and uncoupled cars frequently before this. The couplings to the cars which plaintiff was uncoupling, were good, for I inspected them ten minutes after the accident. They were

in the usual and ordinary condition. The draw-heads were the ordinary draw-heads used upon all freight cars, and were loose. They work on a spring and play in all directions. They give a little each way, and are made so to enable the cars to follow the curves of the track and the surface of the ground. They must have "give" to break the force of cars coming together. Coupling and uncoupling cars is a dangerous business, and requires care and caution. When performing their work, it is the brakeman's duty doing the work, to signal the engineer. They are supplied with lanterns; plaintiff had one and it was lit. It was a dark night, the night of the accident. It was not raining. I do not remember if it was cloudy or not. It is usual to couple and uncouple cars at all hours of the night, and in all kinds of weather, and this is a part of a brakeman's duty.

"The brakemen have no opportunity to make more than a general examination to see that nothing is out of order as they pass along, their inspection is confined more especially to the wheels. In speaking of couplings, I allude to them as distinct from the draw-heads, and when I say these draw-heads were loose, I do not say that they were in the same condition as the draw-head which caused the injury to plaintiff. Had I known the condition of this one, I would have warned plaintiff that it was loose. When we use the term loose in reference to a draw-head, we do not mean the way it is usually hung. Coupling is more dangerous than uncoupling cars. The draw-head by which plaintiff was hurt belonged to a T. & P. Ry. car, numbered 1874. I do not know that the draw-head was loose prior to leaving Texarkana, it might have been made so after leaving Texarkana, from the weight and jolting of the train. I cannot say where it was done."

*J. H. Morgan* testified : " Have practiced medicine twenty-five years. From my knowledge, derived from examining health and mortuary reports, I should say that the expectancy of life of men like plaintiff, of same age and constitution, would be from forty-six to fifty years old. A railroad man's expectancy of life would be much less. It has been established at seven years."

*F. G. Hentz* testified for defendant : " I am foreman in the car repairing department of defendant, and the Texas & Pacific Railway, at Texarkana. Have been in that business fifteen years. My duty, as foreman, is to repair cars. The car inspector inspects the cars on the track, and if in bad order marks them " B. O." on the side. The yard-master then sets them out on the repair track, and I have them repaired. After being repaired, the " B. O." is rubbed out, and " D." put on them."

*Pat Callahan* testified : " In December, 1882, and for some time prior and subsequent, I was joint yard-master of defendant and the Texas & Pacific Railway Company, at Texarkana. It is my duty to make up trains for both roads. I first examine cars to see if they are in good order ; am governed by the car inspector's mark. My custom and instructions are never to put into a train a bad order car. I made up the train going north December 29, 1882. I never heard that any bad order car was put into the said train on that day. I have had experience as a brakeman on defendant's road, and know their duties and instructions as to coupling and uncoupling cars. *It is not their duty, and they are, by the rules of the company, particularly forbidden to uncouple cars while in motion. The instructions require them to wait until the car stops, but brakemen do not always obey the instructions.* The time to pull the pin is when the slack is given sufficient to pull the pin. I know from experience, that it is possible for a brakeman to get

his hand caught between the coupling-pin and the dead-wood while uncoupling cars, simply by negligently catching hold of the pin, and in drawing it, allowing it to slant wrongly. My hand was caught that way once, when there was no defect in the draw-head of the car. The way to take hold of the coupling-pin in uncoupling is, to catch it from above with the fingers around it, holding the hand perpendicular over it."

*Connors* testified: " Am joint car inspector of defendant's road and the Texas & Pacific Railway Company at Texarkana, and have been since 1878. Luke Hickey and I were both filling that office in December, 1882. We take it alternately, one week in the day time and one week in the night time. Christmas week, 1882, December 29, I watched at night and Hickey in the day time. Our duties as car inspectors are, to inspect thoroughly every car that comes into the yard from either road, looking them all over for defects or injuries, to see whether they are in good condition or need repairs. I look them over, examine draw-heads and springs, and see that springs are not broken or anything out of order. If I find anything out of order, I repair it myself if I can, with the aid of two men that are under me. If not, I mark ' B. O.' on it, to show it is in bad order. The yard-master, on seeing this mark, sets it out on the repair track for repairs. I do not recollect inspecting Texas & Pacific car No. 1874, in December, 1882. *We keep no record of cars inspected and found in good order*, but I do know I inspected all the cars coming in while I was on duty that month, and marked all of those I found in bad order, as above stated. All cars that come in while I am on duty, I inspect carefully, and I did that in December, 1882."

*Luke Hickey* testified : " I am, and have been, since 1881, car inspector of defendant and the Texas & Pacific Rail-

way Company at Texarkana, jointly with Connors. When he is not on duty I am, and *vice versa.*

" I make my inspection as soon as the cars come in; examine to see that nothing is broken or out of order, and if out of fix and I can repair them with my two men, I do so. If I can not, I mark them ' B. O.' for the yardmaster to have them repaired. I do not remember anything about car 1874, but I inspected carefully all cars coming in while I was on duty."

This is all the evidence there was on either side.

The charge of the court was favorable to the plaintiff, and the jury gave him a verdict for $3,500.

The assignments in the motion for a new trial are:

*First*—The verdict is not sustained by the evidence.

*Second*—That it is contrary to law.

*Third*—That it is excessive, and shocks one's sense of justice.

*Fourth and fifth*—Misdirection of the court.

This action, like all others brought by the servant against his master for personal injuries sustained in the course of his employment, is based on actual negligence in the defendant, or in those who represent it. The negligence here complained of consisted in using a freight car with a defective draw-head. From the testimony adduced in behalf of the plaintiff, it may be doubted whether any serrious defect existed in the draw-head, or in any of the appliances connected therewith; and whether the proximate cause of the accident was not the plaintiff's own recklessness in attempting to uncouple the car while it was in motion, contrary to an express regulation of the company, which must have been known to him, as it related to one of his principal duties and he had been in the company's service for some time.

St. L., I. M. & S. Ry. v. Gaines.

In *Lockwook v. C. and N. Ry. Co.*, *55 Wisc.*, *50*, such evi-
dence of contributory negligence on the part of a brakeman,
who was killed in the act, was held sufficient to justify a
compulsory non-suit in an action for his death.

But regarding these matters as settled by the verdict,
viz.: That there was in fact such a defect as is alleged, and
that the plaintiff was duly careful, the question yet re-
mains whether the defendant is liable on account of such
defect. The master is not an insurer of the servant's
safety, nor does he guarantee that the machinery, tools
and instrumentalities he furnishes may not prove defective.
He only undertakes to use reasonable care to prevent such
results. *L. R. and F. S. R. Co. v. Duffey*, *35 Ark.*, *602*; *St.
L., I. M. and S. Ry. v. Harper*, *44 ib.*, *529*.

> 1. Master's liability to servant for defective tools.

The presumption is that the master has done his duty by
furnishing safe and suitable appliances for the performance
of his work. And when this is overcome by positive
proof that the appliances were defective, the plaintiff is
met by a further presumption that the master had no notice
of the defect and was not negligently ignorant of it. It is
not sufficient to show that the plaintiff was injured, and
that the injury resulted from a defect in the machinery;
but he must go further and establish the fact that the injury
happened because the master did not exercise proper care
in the premises. *Shearman & Redfield on Negligence*, *sec.
99*; *Thompson on Negligence*, *1053*; *Wood on Master and
Servant*, *sec. 382*; *Pierce on Railroads*, *373, 382*; *3 Wood's
Railway Law*, *1505*; *St. L., I. M. & S. Ry. v. Harper*,
*supra*; *K. C., S. & M. R. R. v. Summers*, *45 Ark.*, *295*; *L.
R. & F. S. Ry. v. Townsend*, *41 ib.*, *382*; *Hayden v. Smith-
field Manf'g Co.*, *29 Conn.*, *548*; *DeGraff v. N. Y. & H. R.
R. Co.*, *76 N. Y.*, *125*; *E. St. L. P. & P. Co. v. Hightower*,
*92 Ill.*, *139*.

> 2. Same.

St. L., I. M. & S. Ry. v. Gaines.

The court refused a prayer of the defendant, which correctly stated the law on this subject; and the error was no cured by other directions.    There is no proof that the railroad company, or any of its employes, had any knowledge of any defects in the coupling apparatus of the car or its fastenings prior to the accident.    The car did not belong to the defendant, but to a connecting carrier.    It was duly inspected on the same day the accident occurred and pronounced to be road-worthy by being placed in the train. There is no reason to suppose the car inspector was incompetent or that, on this particular occasion, he performed his duty carelessly.    The plaintiff himself could not say whether the break in the spring was recent or of long standing. The spring might have been broken after the train left Texarkana.    There is not a particle of evidence that the defendant omitted any duty which it owed to the plaintiff.

Now, notice of the alleged defect, or what amounts to the same thing, the means of knowledge which the company failed to use, was a material fact which was necessarily involved in the verdict.    Consequently, as no testimony was given from which the jury could infer that the company knew, or might by reasonable diligence have discovered the defect in time to remedy it and prevent the casualty, the verdict is not supported by sufficient evidence.

3. Car inspector and brakeman fellow servants.    And even had it been shown that the drawhead was loose or broken before the train was sent out, and that the defect was discoverable upon a proper inspection, yet the plaintiff cannot recover for the negligence of his fellow servant.    Here, again, the court committed an error to the prejudice of the defendant; for it refused to tell the jury that the car inspector and the brakeman were fellow servants.    They are not only employed and paid by the same corporation, but their separate services have an immediate

common object—the moving of the trains. Neither works under the orders or control of the other; and each takes the risk of the other's negligence in the performance of his service.. *Randall v. B. & O. R. Co. 109 U. S., 478.*

Car inspectors are not placed in charge of a separate department of the company's business, nor do their duties require any special mechanical skill. They make a general cursory examination of cars, upon arrival at the yard, so as to detect any patent defects. That they are co-servants with the trainmen has been frequently decided. *Hodgkins v. Eastern R. Co., 119 Mass., 419; Mackin v. B. & A. Railroad, 135 ib., 201; Besel v. N. Y. C. & H. R. R. Co., 70 N. Y., 171; Railroad Co.'s v. Webb, 12 Ohio St., 475; Railroad Co. v. Fitzgerald, 42 ib., 318; Railroad v. Foster, 10 Lea. (Tenn.), 351; Smith v. Flint and Pere Marquette Ry., 46 Mich., 258; 3 Woods, 313.*

Indeed, we know of no cases which hold the contrary view, except *Tierney v. M. & St. L. Ry. Co., 33 Minn., 311; S. C. 24 Am. L. Reg., 669,* decided by a divided court, and *Cooper v. Railroad Co., 24 W. Va., 37.*

*Atchison, Topeka and Santa Fe R. Co. v. Wagner, 33 Kansas, 660, S. C. 21 Cent. L. Jour., 53,* is precisely similar to the present case; the negligence imputed to the railroad company being the use of a passenger coach with a draw-bar connected with a defective spring. The following propositions are there announced, which we approve of as sound law:

" 1. An employe of a railroad company, by virtue of his employment, assumes all the ordinary and usual risks and hazards incident to his employment. 2. As between a railroad company and its employes, the railroad company is not an insurer of the perfection of any of its machinery, appliances or instrumentalities, for the operation of its railroad. 3. As between a railroad company and its employes,

the railroad company is required to exercise reasonable and ordinary care and diligence, and only such, in furnishing to its employes reasonably safe machinery and instrumentalities for the operation of its railroad.   4. It will be presumed, in the absence of anything to the contrary, that the railroad company performs its duty in such cases, and the burden of proving otherwise will rest upon the party asserting that the railroad company has not performed its duty.   5. And where an employe seeks to recover damages for injuries resulting from insufficiency of any of the machinery or instrumentalities furnished by the railroad company, it will not only devolve upon such employe to prove such insufficiency, but it will also devolve upon him to show either that the railroad company had notice of the defects, imperfections or insufficiencies complained of, or that by the exercise of reasonable and ordinary care and diligence, it might have obtained such notice.   6. And proof of a single defective or imperfect operation of any of such machinery or instrumentalities resulting in injury, will not of itself be sufficient evidence, nor any evidence, that the company had previous knowledge or notice of any supposed or alleged defect, imperfection or insufficiency in such machinery or instrumentalities.   7. As between a railroad company and its employes, the railroad company is not necessarily negligent in the use of defective machinery, not obviously defective, but it is negligent in such cases only where it has notice of the defects, or where it has failed to exercise reasonable and ordinary diligence in discovering them and in remedying them."

And in *Atchison, T. & S. F. R. Co. v. Ledbetter*, decided by the same court, *8 Pacific Rep., 411*, the syllabus is as follows:

" In an action by a yard switchman against a railroad company, in whose employ he had been, for injuries alleged

St. L., I. M. & S. Ry. v. Gaines.

to have resulted in consequence of a defect in the draw-bar of a car, or in some of its accompanying appliances, *held*: that no recovery can be had against the railroad company except by proof of negligence on its part, and that it devolves upon the plaintiff to prove the negligence, and to prove all the facts which constitute or make apparent such negligence; and therefore, when it was not shown that the railroad company had any knowledge of the defect existing in the draw-bar or in some of its accompanying appliances prior to or at the time of the injury, or that such defect had existed for any considerable length of time, nor what was the nature or character of the defect; that it was obvious or manifest, or could have been discovered by the exercise of reasonable care and diligence, or by any of the tests employed by car inspectors; nor that the car had not been properly inspected by the car inspector at the yard where the injury is alleged to have occurred; *held:* that no negligence is shown on the part of the railroad company and that no cause of action against the railroad company has been proved."

In *Skellenger v. C. & N. Ry. Co., 61 Iowa, 714,* the trial court, after the testimony was all in, tending to prove a state of facts somewhat similar to the present case, directed a verdict for the defendant; and its action was approved on appeal.

The judgment is reversed and the cause remanded for further proceedings.